Thank you, Your Honor. The key issue in this case on the 523A4 claim is the insolvency issue. And I believe that the BAP made a mistake and the trial court made a mistake on that. They held that the entity, Microski, was not rendered insolvent by the transfer of the assets because it could get the assets back. But looking through the California Commercial Code, it does define insolvency, and that definition includes not being able to pay debts as they come due or not paying debts as they come due. And I believe the testimony in this case was very clear. It came from the defendants in the matter that the entity was shut down approximately on October 28th or a few days thereafter. Not every time a debtor becomes insolvent, does it become a trust or does it become a non-dischargeability case? That's correct, Your Honor. But I have to get over that. I, for one, don't see what you've got here other than a bad business deal and a client who didn't take sufficient precautions by getting security, credit, you know, one of those things. All right. On the 523-84, I don't have to get into their intent. All I have to show is that the entity, Microski, was insolvent and that there was a transfer that occurred. You have to show some sort of... Defaultation. And that does not include a bad intent. That just shows that funds were misappropriated or sent someplace else after the corporation was rendered insolvent. And I believe that has occurred here. They entered into this agreement to transfer all the assets, clearly rendered the corporation insolvent. Based on that, the transfer of the assets would then constitute a defaultation. And that's what the Jackson-Calamire cases address that issue. That would have been a good argument if the bankruptcy court had found in your favor. But the bankruptcy court took evidence and found against you. Yes, but they only found against me on that issue because they said the corporation wasn't rendered insolvent by the transfer of the assets. And I'm saying that that was wrong. As a matter of law? Yes. I'm saying as looking at the California Commercial Code and the evidence... Well, look what happened. They transferred the assets and yet the entity continued to operate. At least this is what the bankruptcy court found. I mean, you're shaking your head, but that's certainly one view of the evidence. Maybe the view you like. There's no evidence to support that. The record is clear. The defendants testified. They shut the business down. They shut it down. They didn't continue to operate. They continued filling orders or trying to fill orders as a subsidiary of the new entity. Of PIE, but they did not follow through on Microski. They shut it down. They testified to that. And the agreement that they entered into or Microski entered into with PIE said that no liabilities of Microski were being assumed. And in fact, and I cited in the record, they say that they continue to pay debts, but there's no... So where's the defalcation? The defalcation is the transfer of the assets, and then they get the consideration in return. The consideration was not paid back to the corporation.  So is it the transfer of the assets that constitutes the defalcation as far as you're concerned? Yeah. The significant events that occurred following the agreement to transfer the assets was that the consideration was paid to the Bells personally. That was clearly a fraudulent conveyance. The consideration should have been paid to the corporation, but it wasn't. Now, I also addressed this issue. I believe you don't have to get to the insolvency issue, although that was the key to the 523A4 case. You can also look to their admission that they were a fiduciary of the creditors. Can I go back to the asset transfer for a second? Yes. The sale was made to PIE. All the corporate assets were transferred to PIE, including the bank accounts. Is that right? I believe everything. Everything went to PIE. And so at that point, the corporation has nothing, right? I believe so. The BAP says the corporation had the right to buy back the assets if a condition was not met, and that's why the corporation is not insolvent, right? Let me read it. The bankruptcy court held that Microski did not become insolvent because under the contract, the corporation had the right to buy back the assets. Yes, that's what the BAP held. But the corporation had no assets at that time. Correct. My argument on that was the BAP said, okay, they transferred the assets. They can get the assets back. Therefore, they're not insolvent. But the problem was twofold in my view. One, the assets get transferred, and then the Bells get the consideration. So if the corporation had gotten the consideration, then the corporation could give the consideration back to PIE and then get the assets in return. But given that it did not get the consideration, it couldn't give it back in order to get its assets back. As a factual matter, your contention is the BAP is wrong because there was no way the corporation could buy the assets back because the corporation didn't have anything, including the bank accounts. Yes. And then legally they're wrong because under California law, which applies here, insolvency isn't just defined. Your wrong is saying that the BAP is wrong because, of course, the Bells had the money, and they could put it in the corporation to buy it back if proved necessary. But they didn't do that, Your Honor. That would be my next question. What did they do with the money? They kept it. Didn't they pay off other loans? They paid off. There was testimony that they paid off two loans that they were personally obligated on. I believe it was Wells Fargo and some other entity. But I think that's a little slight of hand if we're getting into the money. The issue isn't how much the value of the stock was that they got. It was what value did they place on the assets that were being transferred to PIE. If we get into that, that was $800,000. They'd agree it had a fair market value. So it doesn't really matter what the ultimate amount of share value they got.  What I'm trying to get at is, to try to understand your argument, it seems to me, for starters, the BAP may be wrong in saying that the corporation was not insolvent when the sale was made because, in fact, all the assets were transferred from the corporation to PIE, leaving the corporation, leaving Microski was zero. That's right. Then the next thing is, okay, so now we have an insolvent company. The next thing we have is the Bells taking the money that should have gone to the corporation and using it to pay their own debts. That's the defalcation. Yes, misappropriation of corporate assets. And there's no intent required there. Then, and I only have a few more seconds, but I believe also there was an error on the 523A6 claim. There was evidence presented that Mr. Bell testified in the district court action, A, that Microski was continuing to operate. This was back in 97 after they'd shut Microski down. Is that enough to constitute intent to deceive? I believe so, given the other facts. They testified falsely about that. They testified that Microski had gotten the consideration, which turned out to be not true. They admitted to these facts. And then if you look at the sequence of the letters, the letters go back. They have this October 1st agreement where they're going to get the consideration for the transfer of the corporate assets. A few days later, they enter into a letter agreement with U.S. Export. They make promises. They're going to give the money back. They're going to follow through on one of the orders. I think that's October 6th. Then on the very day, October 28th, that the transfer, the deal with PIE is set to conclude, they then write back, deal goes through, they write back to U.S. Export and say, we're sorry, we're not going forward with any of this. Then they shut the business down. Then U.S. Export goes after them for an account receivable they could have recovered. They lead the district court into believing that Microski is still operating, so that they're not able to have to get that account receivable attached. And then we end up getting a default judgment. I think that sequence of facts clearly demonstrated that they knew what they were doing. They were transferring the assets. They're getting the consideration personally in order to shut the business down. I mean, clearly there's enough there they could have supported the finding, but you want to tell us it's a compulsive finding. Yes. That's a heavy burden to bear. It is, Your Honor. I think I only have a few seconds left, so I'll reserve that. Good morning, Doug Bell and Procur. I find that we had sent in a note telling you that the findings of facts and conclusions of law that were rendered in the first two trials, that we had nothing further to add. I would like to address several of the things that the attorney said. Microski was not shut down. Microski was, in fact, put in as a division of PI and continued to operate. Am I correct, Mr. Bell, that when the asset sale was entered into, all the assets of Microski was transferred to PI? That's correct. Leaving Microski with nothing. Microski, the name Microski, went with that and continued to operate. Microski Limited, the corporation, had nothing left after that. The thing we did have was the right of rescission of that agreement if, in fact… And no assets to buy back the… We were advised by our accountant that that was the appropriate way to do it. I'm not saying you didn't get the advice, but, I mean, that's the reality of it. All of the assets went to PIE, and what was left with Microski is goose egg. If the rescission has no value. The consideration for the sale never went to the corporation. The consideration for the sale went to you and Mrs. Bell. That is correct on the advice of our accountant. So now the corporation has no assets to pay any of its debts because the sale proceeds are in your pocket. There was no cash. There was no cash consideration. There was some stock that was… As a matter of fact, the stock didn't get issued for almost a year. And on the advice of the accountant, all this stuff went to you and Mrs. Bell, not to the corporation. All the corporation they sought is one and the same. What happened to the money that was, or the stock that you got from PIE? The stock was not issued for almost a year, and… Did you pay some loans off with the proceeds of that? What we did have when the pie ended up going bankrupt, that it then put us in a position that the only thing that we had to offer any of the people that we owed money to was the stock. And there were several banks that accepted some of that stock in lieu of payment. So… Who were they? Whose loans? What loans were these that you paid off? They were business loans that were part of Microski, Microski Limited, that went with it. And the fact is that as we continued to operate Microski Division of PIE, we did, in fact, continue to pay the debts of Microski. So the intent was for Microski to continue operating as it has only under the umbrella of PIE. As a division of PIE, not a separate corporation, is that what you're saying? I'm sorry? As a division of PIE, not a separate entity? That's correct, a division of PIE. And unfortunately, PIE had a, at the time that we decided to make this move, we had begun to get some sales in Microski, and we were looking to enhance our business. We went with PIE, who happened to have a patent on a new process, a new connector for the snowboard industry. And they had something like two and a half, three million dollars in sales of that product. It looked like a very safe thing for us to merge the two together. We would then be able to enhance our Microskis. Unfortunately, they had a manufacturing snafu that destroyed their business. And as their business went down the tube, because we were division, they took whatever revenue we had, went into their bankruptcy. I might point out that U.S. Export did not pursue this matter for well over a year, and that they had been notified of this decision to transfer the assets and to work with PIE. They had every opportunity to pursue PIE for satisfaction of the judgment. They chose not to do that. Who were the borrowers on those loans that you paid off with the stock? It was Microski Limited. Were you personally liable on those? With a personal guarantee by both my wife and myself. Here's the way it looks to me. Tell me what I'm missing. Looks to me like you've sold off all the assets of Microski Limited. The sale, the proceeds for which go to you personally, leaving the corporation judgment-proof. And then you go and take the assets for the sale that should have gone to the corporation and use it to pay off loans for which you and Mrs. Bell are liable to the prejudice of the Microski creditors. No, I don't believe that's so. Part of that is wrong. Yes. The part of it is that we did not get any asset. We got shares of stock that were supposed to be worth something in a future period of time in agreement with PIE that we continue to operate Microski as we had done. And, in fact, we shipped more skis to the plaintiff after the transfer. In an effort to resolve the issue with him, the U.S. export was selling to a gentleman in Japan. I flew to Japan. I met with him. We had shipped him a number of skis on this contract, and they had a habit of you send them merchandise, and then it was always there was something wrong with it. We shipped several hundred pairs of skis to him, and he started to say, well, these are no good. I flew to Japan, and I met with Mr. Seno. I asked him to see those skis that he was calling defective. He told me they were in a warehouse somewhere in Japan and would not let me go see them. Well, be that as it may, they got a default judgment against Microski, right? I'm sorry? They got a default judgment against Microski. U.S. export did, yes. That's what we're talking about. Yes. But they can't collect because Microski is judgment-proof, has no assets. They had every opportunity. They had more than a year. The reason they don't have the assets is because the assets went to you. The assets. The only thing that we got was some stock that was worth very little at the time. All of the money, all of the bank accounts, all of the assets of the company were put into Microski's division of Pi. We continue to operate as if and try to. Was there any assumption of liabilities by Pi? They got the assets. What about the liability? The assumptions, while they would state in their agreement that they were not assuming it, they did, in fact, direct me to continue paying the bills from Microski Limited, which we did. Out of PIE funds? Out of PIE, out of Microski division of Pi. So basically, yes, Pi. So why didn't they pay this particular debt off? What happened was we had a conflict about the quality of the product. The Japanese people had come several times. And, again, as I say, I went to Japan to discuss this. And we finally said to them, look, we're not willing to ship you any more merchandise until you put us in touch with your customer and you have your customer tell us why every one of these skis is not any good. We manufactured other skis for other accounts and didn't have any problem. And I believe what happened, there was a problem in Japan between two or three of the buyers. They got into a hassle. And that's the reason that we simply said, look, we're not going to manufacture any more, because every time we send you something, the thing was, they're not up to our standards. And therefore, you have to give us a better price. And at that point, we just said, no, we'll continue manufacturing and fill your orders, but not until we meet with the ultimate buyer to find out what the real problem is. Okay. Thank you. Two points, Your Honors. One, Mr. Bell just said that it wasn't true that Microski was shut down after the agreement went through. The testimony by Mrs. Bell was, so after October 28th, Microski was defunct. Is that correct? Yes. And question, it wasn't doing business? No. The evidence was clear. It was shut down. And secondly, this is one of those records. Is that inconsistent with the notion of it's operating as a division of pie? Yes, particularly since they've acknowledged that there was no assumption of liabilities. Yet they were paying off debts. The only evidence before the court, and the only evidence cited in the record, is they paid off two debts that they were personally obligated on. Corporate debts. Yeah, that they were personally obligated on. They didn't pay off any other debts. They were corporate debts. They were, that they were personally obligated on. Well, they were cosigners or something. They were personally guaranteed. They were debts of the corporation. They may also have been personally liable, but they were debts of the corporation. But there was no other evidence that any other debts were paid off. And they'd agreed to repay approximately $90,000 to us in that letter that they'd sent just before they transferred. Cash? I thought they got stock back. No, they had agreed to pay my client. What did they get for the corporation when they? They were to get shares. So this was not, again, cash that they pocketed? No, shares with value. Presumably they sold them and got money out of them. That wasn't. When you say presumably, it means you don't know. I do not know. I know that they said they used some of the money. You said that the shares of the corporation eventually went under, right? I know that they got some money out because they said. I asked you a question. The PIE, yes, filed for bankruptcy. So there are shares of the corporation that's now bankrupt? The evidence I believe that was before the court was that they got shares. They liquidated those. They used the money to pay off, at least in part, these debts that they were personally obligated on. But, again, my point is that's meaningless. The fact is they had $800,000 in assets. They said the fair market value of the assets of the corporation was $800,000. That got transferred. The fact that PIE might have dropped in value a year later is not my client's problem or fault or something it has to explain. How do we know it's $800,000? Because they agreed in the agreement that the assets had a fair market value of $800,000. Which agreement? In the agreement they signed with PIE. Well, so what? Well, that's how much the assets of the corporation were worth. Maybe they were, but that is the evidence before. Is there a finding? Is there a finding in how much the assets of the corporation? The court did not specifically address that issue because it held that the corporation was not insolvent. That's a long way of saying no, Your Honor. Okay. My final point, this is a rare case. The defendants actually or Mr. Bell actually admitted that he saw no distinction between himself and Microski and his wife when it came to the assets. Microski's assets were his assets. But when it came to the debts of Microski, those debts were not his debts. They were Microski's debts. Well, you're trying to pierce a corporate veil, are you? No, but I think that shows the mindset here. Clearly showed at trial that they felt free to take the assets, but they felt no obligation to pay off the debts. Good evidence of the trial factor found for you.  Case is filed. Okay. Next case on the calendar. I understand the counselor here in the Colina case. Welcome back. Good morning, Your Honors. Terry Law on behalf of the petitioner appellant, Mr. Delbert Paulino. How are you? Good. Well, Your Honor, thank you. How are you?
judges: Kozinski, O'scannlain, Silverman